**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**CLARKSBURG**

**JANET L. LINGER,**

                        Plaintiff,

**v.**                                                    **CIVIL ACTION NO.: 1:15-CV-107**
                                                         **(KEELEY)**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social**
**Security,**

                        Defendant.

## REPORT AND RECOMMENDATION

### I.    INTRODUCTION

On June 19, 2015, Plaintiff Janet L. Linger ("Plaintiff"), through counsel Jan Dils,

Esq., filed a Complaint in this Court to obtain judicial review of the final decision of

Defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"

or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42

U.S.C. § 405(g) (2015). (Compl., ECF No. 1). On August 26, 2015, the Commissioner,

through counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an

Answer and the Administrative Record of the proceedings. (Answer, ECF No. 6; Admin.

R., ECF No. 7). On September 24, 2015, and October 14, 2015, Plaintiff and the

Commissioner filed their respective Motions for Summary Judgment and supporting

briefs. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 10; Def.'s Mot. for Summ. J.

("Def.'s Mot."), ECF No. 12). On October 26, 2015, Plaintiff filed a Reply to the

Commissioner's brief. (Pl.'s Reply to Def.'s Br. ("Pl.'s Reply"), ECF No. 14). The matter

is now before the undersigned United States Magistrate Judge for a Report and

Recommendation to the District Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR Civ P 9.02(a). For the reasons set forth below, the undersigned finds that substantial evidence supports the Commissioner's decision and recommends that the Commissioner's decision be affirmed.

## II.  PROCEDURAL HISTORY

On November 3, 2011, Plaintiff protectively filed a Title II claim for disability and disability insurance benefits ("DIB"), alleging disability that began on October 25, 2011. (R. 13, 154). Because Plaintiff's earnings record shows that she acquired sufficient quarters of coverage to remain insured through December 31, 2016, Plaintiff must establish disability on or before this date. (R. 13). On February 10, 2012, Plaintiff's claim was initially denied. (R. 87). Subsequently, on September 5, 2012, Plaintiff's claim was denied again upon reconsideration. (R. 13, 99). After these denials, Plaintiff filed a written request for a hearing. (R. 106).

On January 30, 2014, a hearing was held before United States Administrative Law Judge ("ALJ") Karen B. Kostol in Morgantown, West Virginia. (R. 13, 28, 122). Plaintiff, represented by counsel Ambria Adkins, Esq., of Jan Dils Attorneys at Law, LC, appeared and testified, as did Gina Baldwin, an impartial vocational expert. (R. 28, 115, 117). On February 24, 2014, the ALJ issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Social Security Act. (R. 10). On April 21, 2014, Plaintiff requested that the Appeals Council review the ALJ's decision and submitted additional records for the Appeals Council to consider. (R. 221). The Appeals Council reviewed the additional records but determined that they were not relevant because they were dated after February 24, 2014, the date of the ALJ's

2

decision. (R. 2). On April 23, 2015, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (R. 1).

## III. <u>BACKGROUND</u>

### A. Personal History

Plaintiff was born on August 19, 1951, and was sixty years old at the time she filed her claim for DIB. (<u>See</u> R. 61). She is 5'6'' tall and weighs approximately 179 pounds. (R. 182). She is married and lives with her husband. (R. 33). She graduated from high school, attended one year of college and completed cosmetology school. (R. 34, 182). Her prior work experience includes working as a gas station cashier, auditor in a cash office, companion and Quick Mart cashier. (R. 54-55). She alleges that she is unable to work due to the follow impairments: (1) back and bilateral shoulder impairments; (2) arthritis; (3) osteoarthritis of the left hip; (4) left knee arthritis; (5) right knee arthritis; (6) numbness and tingling in her legs and left hand and (7) diabetes mellitus. (R. 182).

### B. Medical History

#### 1. Medical History Pre-Dating Alleged Onset Date of October 25, 2011

On September 5, 1988, Plaintiff was involved in a motor vehicle accident in Ohio that resulted in Plaintiff fracturing her pelvis. (R. 356-57). After the accident, Plaintiff was taken to a hospital in Dover, Ohio, where she was placed in "skeleton traction." (R. 356). On September 8, 1988, Plaintiff was transferred from the hospital in Dover to Akron City Hospital. (<u>Id.</u>). At Akron City Hospital, a CT scan of Plaintiff's pelvis was ordered, which revealed "a fracture of her medial wall and iliac wing with slight medial displacement." (<u>Id.</u>). After the CT scan, Plaintiff was diagnosed with a left acetabular fracture. (<u>Id.</u>). On

September 9, 1988, Plaintiff was sent to surgery, where Dr. R. Bell performed an "open reduction, internal fixation of [the] pelvis and left trochanteric osteotomy," during which a plate and two screws were inserted into Plaintiff's left hip. (R. 359, 362). Plaintiff recuperated in the hospital for about two weeks before being discharged on September 22, 1988. (R. 356).

After her discharge from Akron City Hospital, Plaintiff presented for numerous surgical follow-up appointments with Dr. Bell. Immediately following her discharge, Dr. Bell noted that Plaintiff could not bear weight on her left leg and, therefore, would be participating in physical therapy sessions. (R. 366). On October 11, 1988, Dr. Bell instructed Plaintiff that she could start bearing weight on her left leg. (R. 367). On January 17, 1989, Dr. Bell reported that Plaintiff was "ambulating pretty well." (R. 368). However, on June 22, 1989, Dr. Bell noted that Plaintiff had "a bit of a gait abnormality and some weakness and apparent shortening on [her left] side." (Id.). Nevertheless, Dr. Bell further noted that Plaintiff was "coming along very well" and that she had "made marked improvements over the past couple of months." (Id.).

On July 31, 1989, Plaintiff again underwent surgery at Akron City Hospital. (R. 372-73). During this second surgery, Plaintiff was noted to possess a "massive amount of heterotopic bone," or an abnormal presence of bone tissue, that was starting to interfere with her range of motion. (R. 371). Therefore, Dr. Bell excised the heterotopic bone and, additionally, removed the plate and two screws that had previously been inserted into Plaintiff's left hip. (R. 371-72). On August 1, 1989, Plaintiff began radiation therapy to prevent more heterotopic bone from growing. (R. 371). On August 28, 1989, Dr. Bell noted that, while Plaintiff required a cane to walk, she was experiencing "[g]ood

post operative recovery without complication." (R. 378). On October 10, 1989, Dr. Bell

noted that Plaintiff was "back working and carrying on with her life." (R. 369).

On December 8, 2010,[1] Plaintiff presented to the Tri-County Health Clinic, her

primary care facility, for an appointment with Elaine J. Kirchdoerfer, M.D. (R. 292-98).

During this appointment, Dr. Kirchdoerfer noted Plaintiff's medical history. (See R. 292).

Specifically, Dr. Kirchdoerfer noted that Plaintiff had previously been diagnosed with

hypertension, hyperlipidemia, uncontrolled type II diabetes mellitus, diabetic neuropathy

in her feet, osteoarthritis of the back and osteoarthritis of the knee status post

laparoscopic surgery. (Id.). Dr. Kirchdoerfer also noted that Plaintiff was prescribed

Lisinopril for her hypertension, naproxen for her osteoarthritis pain, pravastatin for her

hyperlipidemia, and sitagliptin, metformin and Lantus insulin for her diabetes mellitus.

(Id.).

After Dr. Kirchdoerfer noted Plaintiff's medical history, Plaintiff informed Dr.

Kirchdoerfer that she was experiencing right shoulder pain that occasionally radiated

into her right arm. (R. 293). Additionally, Plaintiff complained of occasional pain,

numbness and a "tingling" sensation in her feet. (Id.). After an examination, Dr.

Kirchdoerfer noted that Plaintiff's feet were cold and that her pedal pulses were

decreased. (R. 292, 297). Dr. Kirchdoerfer ordered an arterial Doppler of Plaintiff's lower

extremities, which showed "[n]o evidence of significant arterial obstructive disease." (R.

316). To treat Plaintiff's symptoms, Dr. Kirchdoerfer instructed Plaintiff to walk

continuously at a fast pace for twenty minutes a day. (R. 298).

---

[1] After October 10, 1989, Plaintiff's treatment notes reflect that she presented to Dr. Bell's office for annual check-ups for approximately four years. (See R. 369, 379). During her last check-up on August 5, 1993, Dr. Bell reported that Plaintiff was "doing fine with her hip." (R. 379). No medical records were submitted for the time period between August 5, 1993, and December 8, 2010.

On March 9, 2011, Plaintiff returned to the Tri-County Health Clinic for an appointment with Dr. Kirchdoerfer. (R. 257-64). During this appointment, Dr. Kirchdoerfer noted that Plaintiff's diabetes mellitus was uncontrolled. (R. 257). Therefore, Dr. Kirchdoerfer changed Plaintiff's insulin from Lantus to Novolog 70/30 and prescribed glyburide, an anti-diabetic medication. (Id.). Dr. Kirchdoerfer also instructed Plaintiff to check her blood glucose levels twice a day and to exercise for one hour a day. (R. 257, 259).

On April 27, 2011, Plaintiff again returned to the Tri-County Health Clinic for a follow-up appointment with Dr. Kirchdoerfer. (R. 265-71). During this appointment, Dr. Kirchdoerfer noted that Plaintiff was "doing well." (R. 267). However, Dr. Kirchdoerfer expressed concern regarding Plaintiff's lipid profile, triglyceride level and blood glucose level. (Id.). Dr. Kirchdoerfer noted that Plaintiff "[is] watching her diet but is not exercising; she works all the time and has to care for a husband [that] has a lot of medical problems." (Id.). After an examination, Dr. Kirchdoerfer informed Plaintiff to cease taking glyburide and changed Plaintiff's insulin prescriptions to Lantus and Humulin 70/30. (R. 265).

On May 23, 2011, Plaintiff presented to the office of Ali Khan, M.D., a primary care physician, to establish as a new patient. (R. 237). During this visit, Plaintiff complained of musculoskeletal pain and of numbness in her hands and feet. (R. 237, 251). After an examination, Dr. Khan ordered a nerve conduction study, which revealed mild bilateral carpal tunnel syndrome and "left common peroneal nerve neuropathy." (R. 251-54). Dr. Khan also noted that Plaintiff's hypertension and diabetes appeared controlled. (R. 237, 246). Over the next several months, Plaintiff returned to Dr. Khan's

office for several follow-up appointments. (R. 232-36). During her follow-up appointment on October 13, 2011, Dr. Khan discontinued Plaintiff's Lantus prescription and prescribed Novolin N insulin instead. (R. 234).

### 2. Medical History Post-Dating Alleged Onset Date of October 25, 2011

On December 6, 2011, Plaintiff returned to the Tri-County Health Center to re-establish the facility as her primary care facility. (R. 272-77). However, Plaintiff was evaluated by Allyson Andrews, PA-C ("PA-C Andrews"), a physician's assistant, instead of Dr. Kirchdoerfer. (R. 277). Plaintiff complained to PA-C Andrews that she suffered from numbness in her hands, feet and left leg and from a burning sensation in her feet and lower legs. (R. 272). PA-C Andrews diagnosed Plaintiff with "paresthesias" and opined that Plaintiff suffered from a vitamin B12 deficiency. (R. 273-74). Therefore, PA-C Andrews administered a one-time dose of a vitamin B12 supplement and prescribed Neurontin for her pain. (Id.). During a follow-up appointment with PA-C Andrews on January 10, 2012, Plaintiff stated that Neurontin controlled her symptoms "very well," although she further stated that it caused her to feel "a little drowsy" during the day. (R. 278-79).

On February 2, 2012, Plaintiff presented to Stonewall Jackson Memorial Hospital for X-rays of her pelvis and lumbar spine. (R. 320-21). The X-rays were ordered due to Plaintiff's complaints of numbness in her legs and of low back pain. (Id.). The X-rays of Plaintiff's pelvis revealed: "evidence or trauma/surgery left hip area [and s]ome [mild] degenerative narrowing of the hip joints bilaterally[,] . . . [t]he appearance [of which] is generally stable from 2007." (R. 320). The X-rays of Plaintiff's lumbar spine were unremarkable. (R. 321).

On April 10, 2012, Plaintiff presented to the Tri-County Health Clinic for an appointment with PA-C Andrews. (R. 280-82). During this appointment, Plaintiff complained of "pain in her left [shoulder] under her arm." (R. 280). Plaintiff explained that the pain worsened upon driving a motor vehicle. (Id.). PA-C Andrews examined Plaintiff, noting tenderness along Plaintiff's "left scapular and posterior shoulder region." (R. 282). After the examination, PA-C Andrews diagnosed Plaintiff with left shoulder pain and instructed her to apply moist heat to her shoulder for her pain. (Id.).

On July 12, 2012, Plaintiff returned to the Tri-County Health Clinic. (R. 341-43). During this visit, Plaintiff was evaluated by Genevieve Larimer, FNP ("FNP Larimer"), a nurse practitioner. (R. 343). During this evaluation, FNP Larimer noted that Plaintiff's hypertension was well controlled, as was her diabetes mellitus on Lantus and Novolog 70/30 insulins. (R. 341). However, FNP Larimer further noted that Plaintiff's neuropathy in her hands and left leg "seem[ed] worse." (Id.). After the evaluation, FNP Larimer updated Plaintiff's list of diagnoses to include sciatica and carpal tunnel syndrome due to her recent X-rays and nerve conduction study. (Id.). FNP Larimer also increased Plaintiff's Neurontin prescription and recommended that Plaintiff wear wrist braces. (R. 343). Finally, FNP Larimer recommended physical therapy, although Plaintiff "refuse[d it] at th[e] time." (Id.).

On August 2, 2012, Plaintiff returned to the Tri-County Health Clinic for a follow-up appointment with FNP Larimer. (R. 345-46). During this appointment, FNP Larimer noted that Plaintiff had stopped taking pravastatin "about a month ago [because] she ran out" and that, as a result, Plaintiff's triglyceride level was elevated. (R. 345). FNP Larimer further noted that Plaintiff's blood glucose level was elevated and that Plaintiff

had not been checking her glucose levels at home. (Id.). FNP Larimer instructed Plaintiff to restart her pravastatin and to check her blood glucose level before every meal. (R. 346). FNP Larimer also increased Plaintiff's prescription of Lantus insulin. (Id.).

On July 1, 2013, Plaintiff returned to the Tri-County Health Clinic. (R. 387). However, Plaintiff was evaluated by Iris Trinidad-Carillo, M.D., instead of FNP Larimer. (Id.). Dr. Trinidad-Carillo noted that, due to complaints of left knee pain, Plaintiff had received X-rays of her left knee recently, which revealed "bone lesions." (R. 390). Therefore, Dr. Trinidad-Carillo ordered that Plaintiff undergo a total body scan at United Hospital Center. (R. 352, 390). On July 5, 2013, Plaintiff received the total body scan, which showed "[s]ignificant abnormal uptake involving the medial left knee" and "[m]ild degenerative uptake in the feet and shoulders." (R. 352). Subsequently, when the results of the scan were compared to the results of some of Plaintiff's previous films, Plaintiff was diagnosed with benign bone lesions "consistent with [osteoarthritis and] degenerative joint disease." (R. 355, 386). On July 8, 2013, during a follow-up appointment regarding Plaintiff's left knee pain, Dr. Trinidad-Carillo instructed Plaintiff to take over-the-counter pain medications for her knee pain. (R. 386).

On December 6, 2013, Plaintiff returned to the Tri-County Health Clinic for an appointment with Dr. Trinidad-Carillo. (R. 380-84). During this appointment, Dr. Trinidad-Carillo noted that Plaintiff's hypertension was well controlled. (R. 382). Dr. Trinidad-Carillo further noted that, while Plaintiff still suffered from paresthesias in her hands and feet, Plaintiff's blood glucose level was normal and that Plaintiff had "changed her diet significantly and [had] started controlling her portions." (Id.). However, Dr. Trinidad-Carillo also documented that Plaintiff's hyperlipidemia was uncontrolled and

that Plaintiff had not yet restarted her pravastatin. (Id.). To treat Plaintiff's

hyperlipidemia, Dr. Trinidad-Carillo instructed Plaintiff to continue with her dietary

changes, start an exercise program and lose weight. (R. 383). Dr. Trinidad-Carillo also

increased Plaintiff's prescription of Neurontin to treat her paresthesias. (Id.).

### 3. Medical Reports/Opinions

#### a. Disability Determination Examination by Bennett Orvik, M.D., February 5, 2012

On February 5, 2012, Bennett Orvik, M.D., a state agency medical consultant,

performed a Disability Determination Examination of Plaintiff. (R. 322-26). The Disability

Determination Examination consisted of a clinical interview and a physical examination

of Plaintiff. (See id.). During the clinical interview, Plaintiff stated that she had fractured

her "hip and pelvis" in a motor vehicle accident in 1988 and that she "ha[d] been having

[worsening] problems ever since [this] . . . accident." (R. 322-23). While Plaintiff further

stated that she suffers from back pain, she revealed that "[h]er main problem is pain in

her left hip and leg area" and that standing and walking "bother her significantly." (Id.).

Finally, Plaintiff stated that underwent a right knee arthroscopy in the year 2000 and that

she has a history of hypertension, hyperlipidemia, diabetes mellitus and neuropathy.

(Id.).

After the clinical interview, Dr. Orvik performed the physical examination of

Plaintiff. (R. 323-26). This examination revealed mostly normal findings. (See id.). In

fact, when summarizing his findings, Dr. Orvik declared that "[Plaintiff's] physical

examination is actually relatively unremarkable." (R. 326).

After completing the clinical interview and physical examination of Plaintiff, Dr.

Orvik determined that Plaintiff suffers from: (1) osteoarthritis; (2) non-insulin dependent

diabetes mellitus with diabetic neuropathy, (3) back pain consistent with lumbosacral strain; (4) hyperlipidemia and (5) hypertension. (R. 325-26). Regarding Plaintiff's current treatment and prognosis, Dr. Orvik noted that Plaintiff's treatment "appears to be [generally] appropriate for [her] various medical problems." (R. 326). However, Dr. Orvik further noted that Plaintiff "has not had any workup of her back pain so the prognosis in area of her back pain is difficult to evaluate." (Id.).

### b. Disability Determination Explanation by A. Rafael Gomez, M.D., February 10, 2012

On February 10, 2012, A. Rafael Gomez, M.D., a state agency medical consultant, prepared the Disability Determination Explanation at the Initial Level (the "Initial Explanation"). (R. 61-69). Prior to drafting the Initial Explanation, Dr. Gomez reviewed, *inter alia*, Plaintiff's medical records, treatment notes and Work History Report. (R. 62-64). After reviewing these documents, Dr. Gomez concluded that Plaintiff suffers from the following severe impairments: (1) osteoarthritis and allied disorders; (2) diabetes mellitus; (3) sprains and strains – all types; (4) hyperlipidemia; (5) essential hypertension; (6) peripheral neuropathy and (7) carpal tunnel syndrome. (R. 65). Dr. Gomez further concluded that Plaintiff's statements regarding her symptoms and limitations are credible. (See id.).

In the Initial Explanation, Dr. Gomez completed a physical residual functional capacity ("RFC") assessment of Plaintiff. (R. 66-67). During this assessment, Dr. Gomez found that, while Plaintiff possesses no manipulative, visual or communicative limitations, Plaintiff possesses exertional, postural and environmental limitations. (Id.). Regarding Plaintiff's exertional limitations, Dr. Gomez found that Plaintiff is able to: (1) occasionally lift and/or carry twenty pounds; (2) frequently lift and/or carry ten pounds;

(3) stand and/or walk for approximately six hours in an eight-hour workday; (4) sit for approximately six hours in an eight-hour workday and (5) push and/or pull with no limitations. (R. 66).

Regarding Plaintiff's postural limitations, Dr. Gomez found that Plaintiff is able to only occasionally climb ramps/stairs, balance, stoop, kneel, crouch, climb ladders/ropes/scaffolds and crawl. (R. 66-67). Finally, regarding Plaintiff's environmental limitations, Dr. Gomez found that Plaintiff must avoid concentrated exposure to extreme heat, extreme cold and vibrations. (R. 67). However, Dr. Gomez further found that Plaintiff need not avoid wetness, humidity, noise, hazards such as machinery and heights or "[f]umes, odors, dusts, gases, poor ventilation, etc." (Id.). After completing the RFC assessment, Dr. Gomez opined that Plaintiff is able to perform her past relevant work as a night auditor. (R. 68).

### c. Disability Determination Explanation by Michael Perll, M.D., May 31, 2012

On May 31, 2012, Michael Perll, M.D., a state agency medical consultant, prepared the Disability Determination Explanation at the Reconsideration level (the "Reconsideration Explanation"). (R. 71-81). Prior to drafting the Reconsideration Explanation, Dr. Perll reviewed the same documents that Dr. Gomez had reviewed when drafting the Initial Explanation, in addition to Plaintiff's updated medical records and treatment notes. (R. 72-75). After reviewing these documents, Dr. Perll differed with one of Dr. Gomez's conclusions contained in the Initial Explanation. (See R. 76-80, 338-39). Specifically, Dr. Perll found that Plaintiff is able to stand and/or walk for approximately two hours in an eight-hour workday, instead of six hours. (R. 77). Excluding this difference in opinion, Dr. Perll affirmed the RFC in the Initial Explanation

and Dr. Gomez's opinion that Plaintiff is able to perform her past relevant work as a night auditor. (R. 79-80, 338-39).

### d. Case Analysis by James Egnor, M.D., June 19, 2012

On June 19, 2012, James Egnor, M.D., performed a Case Analysis of Plaintiff's claim for DIB. (R. 340). Initially, Dr. Egnor noted that:

> This is a [Disability Quality Branch] return with further reduction of the light RFC to [sedentary] work and insufficient vocational documentation to determine ability to perform past relevant work. [Disability Determination Services] had proposed an affirmation of the initial level with RFC for light work for this reconsideration DIB claim.

(Id.). After reviewing Plaintiff's Adult Function Report and medical records, Dr. Egnor concluded that he "generally agree[d] with [the] return." (Id.).

### C. Testimonial Evidence

During the administrative hearing on January 30, 2014, Plaintiff testified regarding her educational background and work history. Plaintiff graduated from high school and attended college for one year. (R. 34). Additionally, Plaintiff completed cosmetology school, although her cosmetology license is "in reserve" because she stopped working as a cosmetologist in the 1970s. (R. 34-35). Her work history includes working for: (1) Wal-Mart Stores, Inc. ("Wal-Mart"), as an "auditor [in] the cash office;" (2) Jackson Quick Mart "as a cashier in the gift shop" and (3) George Hauser, a private individual, as a personal companion for his wife. (R. 37-39). Most recently, Plaintiff worked for Sunoco, Inc., as a cashier. (R. 36). While Plaintiff worked for Sunoco, Inc., for "a number of years," she stopped when "[t]he store closed" and received unemployment compensation benefits until February of 2013. (Id.).

Plaintiff testified that she suffers from multiple physical ailments, including diabetes mellitus, osteoarthritis and feet, hand and knee impairments. (R. 40-46, 50-53). Regarding Plaintiff's diabetes mellitus, Plaintiff is prescribed medication for the condition and her blood glucose levels generally stay "pretty well controlled." (R. 45). Regarding Plaintiff's osteoarthritis, Plaintiff was diagnosed with the condition after she underwent a total body scan in July of 2013 to determine whether she possessed bone cancer. (R. 40). The bone scan was negative for cancer but revealed osteoarthritis "in [Plaintiff's] feet and throughout [her] body." (Id.). Plaintiff is prescribed Neurontin for the pain caused by her osteoarthritis, which helps "some." (R. 41). Regarding Plaintiff's feet impairments, Plaintiff has "problems with [her] feet going numb." (R. 42). For example, Plaintiff's feet feel numb after she awakens in the morning, requiring her to sit on the edge of the bed until she "get[s] the circulation flowing." (R. 46). Plaintiff is also unable to drive a motor vehicle for longer than forty-five minutes to one hour or else her feet "go[ ] numb." (R. 41-42).

Regarding Plaintiff's hand impairments, Plaintiff's hands "go numb" when she uses them. (R. 41). Consequently, Plaintiff experiences difficulty gripping items and occasionally "drop[s] things." (R. 42). She also experiences difficulty with fine manipulation and struggles to pick up coins, "do[ ] buttons," crochet and cross-stitch. (R. 43, 53). Finally, Plaintiff experiences difficulty carrying a gallon of milk. (R. 43). She estimates that the heaviest item she can lift and carry weighs "maybe two pounds, three pounds." (Id.). While Plaintiff's physician suggested that Plaintiff wear wrist braces, she has not worn them because "[t]hey didn't verbally tell me that I needed to use a wrist brace." (R. 42).

Regarding Plaintiff's knee impairments, Plaintiff opined that the impairments began when she was involved in a motor vehicle accident in 1988. (R. 50-51). After the accident, Plaintiff underwent knee surgery to stabilize her left knee. (R. 51). Plaintiff states that she "feel[s] that if [she] hadn't [been involved in] that car accident [she] wouldn't have as many physical problems [as she has] now." (Id.). She explains that she has "just gradually had more problems with [her] physical way of doing things" since the accident. (Id.). Nevertheless, Plaintiff states that her left knee currently "does pretty good." (R. 39). However, she is experiencing "problems with [her] right knee." (Id.). In 2000, Plaintiff underwent surgery on her right knee. (Id.). Subsequently, Plaintiff was instructed that she would eventually need a knee replacement, although she has not undergone one yet. (R. 52). Plaintiff's knee impairments require her to walk with a cane, although the cane has not prevented her from falling a "few times" in the past. (R. 40, 44). Her knee impairments also prevent her from running and squatting and cause her to experience difficulty kneeling. (R. 51).

Plaintiff testified how her physical impairments prevent her from performing some activities but not others. For some activities, Plaintiff requires minimal or no assistance. For example, Plaintiff is able to wash dishes, wash laundry, use a computer and go shopping. (R. 43, 46-47, 52). Plaintiff is also able to care for her husband, who "has a lot of medical problems." (R. 47). While a home health agency also helps care for Plaintiff's husband, Plaintiff prepares his meals and assists with administering his medication. (Id.). However, Plaintiff is no longer able to perform certain household chores, such as cleaning the walls, carpets and windows. (Id.). Plaintiff is also limited to sitting for "about an hour and a half" and standing for "probably a half-hour." (R. 49).

Finally, Plaintiff testified regarding her daily activities. On a typical day, Plaintiff awakens and "sit[s] on the edge of the bed until [she] get[s] the circulation flowing." (R. 46). After awakening, Plaintiff performs her own personal care and prepares breakfast for herself and her husband. (Id.). Plaintiff then "generally just sit[s] in the recliner" with her feet propped up for approximately three to four hours. (R. 46, 48). Occasionally, Plaintiff naps during the day. (R. 49). During the evening, she prepares dinner for herself and her husband. (R. 46). At night, Plaintiff sleeps for only "about five hours." (R. 48).

**D.    Vocational Evidence**

**1.  Vocational Testimony**

Gina Baldwin, an impartial vocational expert, also testified during the administrative hearing. (R. 54-58). Initially, the ALJ informed Ms. Baldwin that the jobs she was "going to count as past relevant work in this case [would] be the job as the auditor in the cash office at Walmart, the job as the cashier at the Jackson Quick Mart, the job as the companion for Mr. Hauser's wife and the job as the cashier at Sunoco." (R. 39). Ms. Baldwin then testified regarding the characteristics of Plaintiff's past relevant work. (R. 54-55). Regarding Plaintiff's most recent employment position as a gas station cashier, Ms. Baldwin characterized the work as light, unskilled. (R. 54). As for Plaintiff's prior work as an office cashier, companion and Quick Mart cashier, Ms. Baldwin characterized the work as sedentary, skilled; light, semiskilled and light, unskilled, respectively. (R. 54-55).

After Ms. Baldwin characterized Plaintiff's past relevant work, the ALJ presented

several hypothetical questions for Ms. Baldwin's consideration. Initially, the ALJ asked

Ms. Baldwin to:

> [A]ssume an individual with the same age, education and past work
> experience as [Plaintiff] with the following abilities. Said individual is
> capable of light lifting, 20 pounds occasionally, 10 pounds frequently, but
> sedentary as far as standing and/or walking no more than two hours in an
> eight-hour day. Said individual is capable of performing all postural
> activities on an occasional basis, said individual must avoid concentrated
> exposure to extreme cold, extreme heat and excessive vibration.
>
> Can an individual with these limitations perform [Plaintiff's] past work?

(R. 55). Ms. Baldwin testified that such an individual would be capable of performing

Plaintiff's past work as an office cashier. (Id.).

Incorporating the above hypothetical, the ALJ then further limited the hypothetical

individual. Specifically, the ALJ stated that the hypothetical individual: (1) must be

allowed to use a cane or other assistive device for ambulation or balance; (2) is capable

of no more than frequent feeling bilaterally; (3) is capable of frequent fingering

bilaterally; (4) is capable of occasional overhead reaching with the left arm; (5) is

capable of occasional handling with the left arm; (6) is not capable of kneeling and (7)

"must be afforded the opportunity for brief one to two-minute changes of position at

intervals not to exceed one hour without being off task." (R. 55-56). Ms. Baldwin testified

that, even with the addition of all of these limitations, the hypothetical individual would

be capable of working as an office cashier. (Id.). When asked to limit the hypothetical

individual to occasional fingering bilaterally, however, Ms. Baldwin testified that such an

individual could not work as an office cashier. (R. 56). Nevertheless, Ms. Baldwin further

testified that the hypothetical individual could work as a surveillance system monitor and credit card information verifier. (R. 56-57).

After completing the hypotheticals, the ALJ presented several additional questions to Ms. Baldwin. (R. 57). First, the ALJ asked whether Plaintiff possessed "skills from her past relevant work that would transfer into the . . . last hypothetical given." (Id.). Ms. Baldwin answered that, while Plaintiff possesses "some transferable skills," the skills would not transfer into the last hypothetical. (Id.). Second, the ALJ asked "[h]ow much time off task . . . most employers [generally] tolerate." (Id.). Ms. Baldwin answered that most employers generally allow employees to be off task for twenty-percent of the workday. (Id.). Finally, the ALJ asked if Ms. Baldwin's testimony was consistent with the Dictionary of Occupational Titles ("DOT") and the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles ("SCO"), to which Ms. Baldwin answered that it was. (Id.).

Plaintiff's counsel, Ms. Adkins, also presented questions for Ms. Baldwin's consideration during the administrative hearing. (Id.). Specifically, Ms. Adkins asked Ms. Baldwin to consider the last hypothetical given by the ALJ with the addition of the following limitations: (1) the individual must "prop their legs up at intervals during the day at waist level" and (2) the individual is limited to occasional handling bilaterally. (Id.). Ms. Baldwin replied that such an individual could not work as an office cashier with the addition of either limitation. (Id.).

### 2. Report of Contact Forms, Work History Reports & Disability Reports

On November 21, 2011, Michelle Randolph of Jan Dils Attorneys at Law, LC, submitted a Disability Report on behalf of Plaintiff. (R. 181-88). In this report, Ms.

Randolph indicated that Plaintiff is unable to work due to the following ailments: (1) back and shoulder impairments; (2) arthritis and osteoarthritis of the left hip; (3) left knee arthritis; (4) right knee arthritis; (5) numbness and tingling of the legs and left hand and (6) diabetes mellitus. (R. 182). Ms. Randolph further indicated that Plaintiff stopped working on October 25, 2011, "[b]ecause of [her] condition(s)." (Id.). Ms. Randolph listed Lisinopril, Metformin, naproxen, pravastatin and Lantus insulin as Plaintiff's prescribed medications. (R. 185).

On November 29, 2011, Plaintiff submitted her first Work History Report. (R. 173-80). While this form was sparsely completed, Plaintiff indicated that she has worked two job positions in the past fifteen years. (R. 173). Specifically, Plaintiff indicated that she has worked in the cash office at Wal-Mart and, more recently, as a store clerk at Sunoco, Inc. (Id.).

On December 15, 2011, Plaintiff submitted her second Work History Report. (R. 189-96). In this more comprehensively completed form, Plaintiff indicated that she has worked as a switch board operator/customer service representative for a department store, night auditor for a hotel, cashier for Wal-Mart and, most recently, senior shift leader for a gas station. (R. 189). When describing the duties of her most recent position, Plaintiff stated that she operated the cash register and provided assistance to customers. (R. 190). She explained that, while she was not required to supervise others, she was required her to "[u]se machines, tools or equipment" and to utilize "technical knowledge or skills." (Id.). She further explained that, in a 6.5-hour workday, the position required her to: (1) write, type and handle small objects for 6.5 hours a day; (2) walk and stand for 5.5 hours a day; (3) reach for 3 hours a day; (4) sit for 30 minutes

a day; (5) lift items no heavier than 20 pounds and frequently lift items weighing ten pounds and (6) climb and kneel for 5 minutes a day. (Id.). Finally, she explained that she was never required crouch, crawl or handle large objects. (Id.).

When describing the duties of her job as cashier for Wal-Mart, Plaintiff stated that she worked in the "cash office." (R. 191). She explained that she was required to utilize machines, tools and equipment and to acquire technical knowledge and skills. (Id.). She further explained that, in an 8-hour workday, the position required her to: (1) lift items no heavier than 20 pounds and frequently lift items less than 10 pounds; (2) stand, reach and handle small objects for 8 hours a day; (3) walk, stoop and handle large objects for one hour a day. (Id.). Finally, she explained that she was never required to kneel, crouch, crawl, sit or climb. (Id.).

On March 31, 2012, a "representative" of Plaintiff submitted a Disability Report-Appeal form on Plaintiff's behalf. (R. 205-11). On this form, the representative stated that Plaintiff's condition had worsened. (See R. 209). Specifically, the representative stated that Plaintiff's "[p]ersonal tasks take longer to complete" and that Plaintiff experiences "[d]ifficulty getting dressed and putting on socks and shoes." (Id.). The representative further stated that Plaintiff is no longer able to walk, stand, squat or run and that she "[m]ust take frequent breaks" when performing physical activities. (Id.). Finally, the representative updated Plaintiff's list of medications to include naproxen, gabapentin, Lisinopril, metformin, Lantus insulin and Novolog insulin. (R. 208).

On June 19, 2012, Rose Bettis completed a Report of Contact form, detailing Plaintiff's job duties as a night auditor for a large hotel. (R. 212). As a night auditor, Plaintiff "performed auditing/bookkeeping duties about 50% of the time and 'hotel clerk'

duties about 50% of the time." (Id.). Regarding Plaintiff's auditing/bookkeeping duties, Plaintiff "verified and balanced [the bookkeeping] entries and records of financial transactions reported by the [hotel's] lounge, restaurant and gift shop." (Id.). Plaintiff then entered the financial information onto a "summary sheet" that was sent to the bookkeeping department. (Id.). Plaintiff was required to "st[and] at the computer" when performing her auditing/bookkeeping duties. (Id.). Regarding Plaintiff's hotel clerk duties, Plaintiff greeted incoming guests, checked the guests into their rooms and answered the telephone. (Id.). Plaintiff "was the only one working at night as a hotel clerk so anyone that came in after 11 pm was checked in by her and any assistance that was needed from the front desk was addressed by her alongside her auditor duties." (Id.).

On October 11, 2012, a "report completer" from Jan Dils Attorneys at Law, LC, submitted a second Disability Report-Appeal form on Plaintiff's behalf. (R. 213-19). On this form, the report completer stated that Plaintiff's condition had again worsened. (See R. 215, 217). Specifically, the report completer stated that Plaintiff had been experiencing increased physical limitations since January of 2012 and "[i]ncreased pain" since September 1, 2012. (R. 215). The report completer further stated that Plaintiff is no longer able to operate a motor vehicle and now requires assistance completing household tasks. (R. 217).

E.    **Lifestyle Evidence**

On December 5, 2011, Plaintiff submitted an Adult Function Report, minus the first page. (R. 197-203). In this report, Plaintiff describes how her impairments impact her ability to perform some activities but not others. For some activities, Plaintiff requires

minimal or no assistance. For example, Plaintiff is able to perform her own personal care and prepare her own meals. (R. 197-98). She is able to operate a motor vehicle independently, leave the house without accompaniment and go shopping in stores. (R. 199). She is able to pay bills, count change, handle a savings account and use a checkbook/money orders. (Id.). She is able to perform household tasks such as dusting, washing laundry and washing dishes. (R. 198). She is able to participate in social activities, mainly socializing with her husband and members of her church, which she regularly attends. (R. 200). Finally, she is able to follow written and spoken instructions, get along with authority figures and handle stress and changes to her routine. (R. 201-02).

While Plaintiff is able to perform some activities, she describes how others prove more difficult due to her impairments. Plaintiff's impairments affect her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs and use her hands. (R. 201). Due to these limitations, Plaintiff is unable to perform certain activities, including yardwork, walking at a brisk pace, running, squatting and cross-stitching. (R. 197, 199). She requires a cane to walk and is limited to walking two to three blocks before requiring five to ten minutes of rest. (R. 201). Her impairments even affect her ability to sleep, although Plaintiff does not detail how. (R. 197).

Finally, Plaintiff details her daily activities.[2] On a typical day, Plaintiff gets out of bed and then watches television, reads and plays computer games. (Id.). At some point during the day, she washes her dishes. (R. 198). In addition to washing dishes, she

---

[2] On November 20, 2013, Plaintiff submitted a form entitled "Claimant's Medications," stating that her daily medications include Lisinopril, Metformin, gabapentin, Lantus insulin and Novolog insulin. (R. 220).

dusts once a week and washes laundry once or twice a week. (Id.). Plaintiff also "tr[ies] to [go outside] each day." (R. 199).

## IV.    THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

[The] individual . . . [must have a] physical or mental impairment or impairments . . . of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. . . . '[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2004). The Social Security Administration uses the following five-step sequential evaluation process to determine whether a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, [your RFC] . . . is evaluated "based on all the relevant medical and other evidence in your case record . . . ."]

(iv) At the fourth step, we consider our assessment of your [RFC] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520 (2015); 20 C.F.R. § 416.920 (2012). In steps one through four, the burden is on the claimant to prove that he or she is disabled and that, as a result of the disability, he or she is unable to engage in any gainful employment. Richardson v. Califano, 574 F.2d 802, 804 (4th Cir. 1978). Once the claimant so proves, the burden of proof shifts to the Commissioner at step five to show that jobs exist in the national economy that the claimant is capable of performing. Hicks v. Gardner, 393 F.2d 299, 301 (4th Cir. 1968). If the claimant is determined to be disabled or not disabled during any of the five steps, the process will not proceed to the next step. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

## V.    ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the Social Security Administration's five-step sequential evaluation process, the ALJ found that:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2.    The claimant has not engaged in substantial gainful activity since October 25, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.    The claimant has the following severe impairments: osteoarthritis; status post remote fracture and open reduction internal fixation of the left hip and pelvis; status post remote excision of the heterotrophic bone formation left hip; diabetes mellitus; hypertension; mild obesity; status post arthroscopy of the left knee; hyperlipidemia; mild carpal tunnel syndrome; mild degenerative changes of the left shoulder; and peripheral neuropathy (20 CFR 404.1520(c)).

4.	The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.	The undersigned finds that the claimant has the [RFC] to perform sedentary work as defined in 20 CFR 404.1567(a) except: can perform postural only occasionally; must avoid concentrated exposure to extreme cold; must avoid extreme heat and excessive vibration; must accommodate the use of a cane or other assistive device for ambulation or balance; must entail no kneeling; must allow for a sit/stand option to allow for a brief one to two minute change of position every hour; must entail no more than frequent bilateral fingering and feeling; must entail only occasional handling with the left upper extremity; and must be limited to only occasional overhead reaching with the left upper extremity.

6.	The claimant is capable of performing past relevant work as a gas station cashier (light, unskilled), office cashier (sedentary, semi-skilled), companion (light, semi-skilled), and quick mart cashier (light, unskilled). This work does not require the performance of work-related activities precluded by the claimant's [RFC] (20 CFR 404.1565).

7.	The claimant has not been under a disability, as defined in the Social Security Act, from October 25, 2011, through the date of this decision (20 CFR 404.1520(f)).

(R. 15-23).

# VI.	DISCUSSION

## A.	Contentions of the Parties

In her Motion for Summary Judgment, Plaintiff contends that the Commissioner's decision "is contrary to the law and is not supported by substantial evidence." (See Pl.'s Mot. at 1). Specifically, Plaintiff contends that the "ALJ's finding that [Plaintiff] was not disabled at [s]tep [f]our of the sequential [evaluation] process is not supported by substantial evidence." (Pl.'s Mem. In Supp. of Mot. for Summ. J. ("Pl.'s Br.") at 12, ECF No. 11). To support her contention, Plaintiff argues that: (1) the ALJ and the vocational

expert misclassified Plaintiff's past work when they stated that Plaintiff had worked as an office cashier and (2) the ALJ erred in determining that Plaintiff is able to perform her past work as an office cashier. (Id. at 13, 16). Plaintiff requests that the Court remand the case for the calculation of benefits or, alternatively, remand the case for further proceedings. (Id. at 20).

Alternatively, Defendant contends in her Motion for Summary Judgment that the Commissioner's decision is supported by substantial evidence. (Def.'s Mot. at 1). To counter Plaintiff's arguments, Defendant contends that the ALJ: (1) properly relied on the vocational expert's testimony that Plaintiff had worked as an office cashier and (2) properly concluded that Plaintiff could perform her past relevant work as an office cashier. (Def.'s Br. in Supp. of her Mot. for Summ. J. ("Def.'s Br.") at X, ECF No. 13). Defendant requests that the Court affirm the Commissioner's decision. (Def.'s Mot. at 1).

**B.  Scope of Review**

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether the ALJ applied the proper legal standards and whether the ALJ's factual findings are supported by substantial evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). A "factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Likewise, a factual finding by the ALJ is not binding if it is not supported by substantial evidence. Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Id. (quoting Consol. Edison Co. v. NLRB, 305

U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). When determining whether substantial evidence exists, a court must "not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ's]." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005).

## C.    Analysis of the Administrative Law Judge's Decision

Plaintiff argues that the ALJ erred in determining that Plaintiff was not disabled at step four of the sequential evaluation process. (Pl.'s Br. at 12). Specifically, Plaintiff argues that: (1) the ALJ and the vocational expert, Ms. Baldwin, misclassified Plaintiff's past relevant work when they stated that Plaintiff had worked as an office cashier and (2) the ALJ erred in determining that Plaintiff is able to perform her past relevant work as an office cashier. (Id. at 13, 16). Each of Plaintiff's arguments will be discussed in turn.

### 1.  Whether the ALJ and the Vocational Expert Misclassified Plaintiff's Past Work

Plaintiff contends that the ALJ and Ms. Baldwin misclassified Plaintiff's past work. (Id. at 16). Specifically, Plaintiff contends that the ALJ and Ms. Baldwin confused Plaintiff's job as a hotel clerk/auditor with her job in the cash office at Wal-Mart and classified the work as that of an office cashier, "a job . . . that [Plaintiff] has never performed." (Id. at 16-17). Defendant argues that "[t]he proper juncture to raise this

challenge was at the administrative hearing when [Ms. Baldwin] was available to testify and answer questions on cross-examination." (Def.'s Br. at 11). Plaintiff contends, however, that she "was not required to raise appealable issues in prior proceedings in order to raise them at Federal District Court." (Pl.'s Reply at 4).

At step four of the sequential evaluation process, the ALJ determines whether the claimant is able to perform his or her past relevant work. 20 C.F.R. §§ 404.1560(b)(1) & 416.960(b)(1). Past relevant work is defined as "work that [a claimant has] done within the past [fifteen] years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it." Id. If the claimant is capable of performing his or her past relevant work, then the ALJ will find that the claimant is not disabled. Id. The burden is on the claimant to prove that he or she is not able to perform his or her relevant work. Richardson, 574 F.2d at 804.

In the present case, the undersigned initially finds that the ALJ and Ms. Baldwin did not intermix and confuse Plaintiff's past work. During the administrative hearing, the ALJ stated that she was "going to count as past relevant work [the following jobs:] [1] *the job as the auditor in the cash office at Walmart*, [2] the job as the cashier at the Jackson Quick Mart, [3] the job as the companion for Mr. Hauser's wife and [4] the job as the cashier at Sunoco." (R. 39). The ALJ never discussed Plaintiff's hotel clerk/auditor position.[3] (Id.). Ms. Baldwin then characterized Plaintiff's past relevant work as: (1) *office cashier*; (2) Quick Mart cashier; (3) companion and (4) gas station cashier. (R. 54-55). Therefore, contrary to Plaintiff's argument, Ms. Baldwin did not confuse Plaintiff's job as a hotel clerk/auditor with her job in the cash office at Wal-Mart. Instead,

---

[3] The ALJ did not list the hotel auditor position as part of Plaintiff's past relevant work. However, Plaintiff did not object to the ALJ's decision to exclude the position from Plaintiff's past relevant work. Therefore, the undersigned will not address this issue.

Ms. Baldwin classified Plaintiff's job in the cash office at Wal-Mart as that of an office cashier.

The undersigned also finds that Ms. Baldwin properly classified Plaintiff's job in the cash office as that of an office cashier. The DOT provides that an office cashier, also known as a cash-accounting clerk, performs the following tasks:

> Receives funds from customers and employees, disburses funds, and records monetary transactions in business establishment or place of public accommodation: Receives cash or checks or completes credit-card charge transactions. *Counts money to verify amounts and issues receipts for funds received.* Issues change and cashes checks. Compares totals on cash register with amount of currency in register to verify balances. Endorses checks and lists and totals cash and checks for bank deposit. Prepares bank deposit slips. Withdraws cash from bank accounts and keeps custody of cash fund. Disburses cash and writes vouchers and checks in payment of company expenditures. Posts data and balances accounts. Compiles collection, disbursement, and bank-reconciliation reports. Operates office machines, such as typewriter, computer terminal, and adding, calculating, bookkeeping, and check-writing machines. May authorize various plant expenditures and purchases. May prepare payroll and paychecks. May issue itemized statement to customer. May be designated according to specialization as Agency Cashier (insurance); Cashier, Front Office (hotel & rest.). When disbursing money in payment of wages, materials, taxes, plant maintenance, and other company expenses, is designated Disbursement Clerk (clerical).

211.362-010 CASHIER I, DICOT 211.362-010 (emphasis added). During the administrative hearing, Plaintiff testified that, as an "auditor [in] the cash office" at Wal-Mart, her duties primarily included "count[ing] money." (R. 39). Therefore, Ms. Baldwin's characterization of Plaintiff's job at Wal-Mart as that of an office cashier is consistent with Plaintiff's testimony.[4] Moreover, Ms. Baldwin, whose expertise is unchallenged,

---

[4] Plaintiff argues that the record is not clear regarding whether Plaintiff ever worked in the cash office during her employment at Wal-Mart. (Pl.'s Br. at 16). Specifically, Plaintiff points to her second Work History Report, contending that "[she] wrote [in the Work History Report] that she worked as a . . . 'cashier' at Wal-Mart, but there was no mention of working at a cash office." (Id.). Plaintiff thus argues that the ALJ should have more fully developed the record before concluding that Plaintiff had worked as an office cashier. (Pl.'s Reply at 5). The

based her characterization of Plaintiff's job on her knowledge of the specific requirements of numerous trades and professions and on her familiarity with the DOT. (R. 54, 57, 117-21). Consequently, the ALJ's statement that Plaintiff's past relevant work includes work as an office cashier is supported by substantial evidence.

### 2. Whether the ALJ Erred in Determining that Plaintiff is Able to Perform her Past Work as an Office Cashier

Plaintiff contends that the ALJ erred in determining that Plaintiff "could return to her past relevant work as an office cashier." (Pl.'s Br. at 13). Specifically, Plaintiff argues that the ALJ failed to follow the procedures set forth in SSR 82-61, 1982 WL 31387 (1982), and SSR 82-62, 1982 WL 31386 (1982). (Id.). Defendant contends that substantial evidence supports the ALJ's finding at step four that Plaintiff is capable of performing her past relevant work. (Def.'s Br. at 8).

Prior to step four of the sequential evaluation process, an ALJ determines the claimant's RFC. 20 C.F.R. § 404.1520(a)(4)(iii). Then, at step four, the ALJ considers the claimant's RFC in relation to the claimant's past relevant work. Id. As previously stated in Part VI.C.1, if the claimant possesses the RFC to perform his or her past relevant work, then the ALJ will find that the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(iii). While the burden is on the claimant to prove that he or she is unable to perform his or her past relevant work, "the [ALJ] has the duty to adequately inquire into the demands of a claimant's past relevant work so that a correct decision can be reached as to [the] claimant's ability or inability to perform it." Richardson, 574 F.2d at

---

undersigned finds that Plaintiff's arguments lack merit. Plaintiff is correct that she listed her job title as "cashier" in her second Work History Report. (R. 189). However, when Plaintiff subsequently described the job in more detail later on in the report, she stated that she worked as a cashier in the "cash office." (R. 191). Therefore, it is undisputed in the record that Plaintiff worked in the cash office at Wal-Mart and no reason existed for the ALJ to more fully develop the record.

804; <u>Platter v. Astrue</u>, No. 1:10-CV-147, 2011 WL 7628535, at *14 (N.D. W. Va. Apr. 27,

2011), <u>R&R adopted,</u> No. 1:10CV147, 2012 WL 1029573 (N.D. W. Va. Mar. 26, 2012).

When determining whether a claimant retains the RFC to perform his or her past

relevant work, SSR 82-61 details three possible tests for an ALJ to use. SSR 82-61,

1982 WL 31387, at *1. SSR 82-61 explains these tests as follows:

> 1.  Whether the claimant retains the capacity to perform a past relevant
> job based on a broad generic, occupational classification of that job, e.g.,
> 'delivery job,' 'packaging job,' etc. Finding that a claimant has the capacity
> to do past relevant work on the basis of a generic occupational
> classification of the work is likely to be fallacious and unsupportable. While
> 'delivery jobs,' or 'packaging jobs,' etc., may have a common
> characteristic, they often involve quite different functional demands and
> duties requiring varying abilities and job knowledge.

> 2.  Whether the claimant retains the capacity to perform the particular
> functional demands and job duties peculiar to an individual job as he or
> she actually performed it. Under this test, where the evidence shows that
> a claimant retains the RFC to perform the functional demands and job
> duties of a particular past relevant job as he or she actually performed it,
> the claimant should be found to be 'not disabled.'

> 3.  Whether the claimant retains the capacity to perform the functional
> demands and job duties of the job as ordinarily required by employers
> throughout the national economy. (The Dictionary of Occupational Titles
> (DOT) descriptions can be relied upon—for jobs that are listed in the
> DOT—to define the job as it is *usually* performed in the national
> economy.) It is understood that some individual jobs may require
> somewhat more or less exertion than the DOT description.

<u>Id.</u> at *1-2. In other words, a claimant will be considered not disabled if he or she

is able to perform his or her past relevant work: (1) as it was actually performed

by the claimant or (2) as it is generally performed in the national economy. 20

C.F.R. 404.1560(b)(2). Typically, the claimant "is the primary source for

vocational documentation, and statements by [the claimant] regarding past work

are generally sufficient for determining the skill level; exertional demands and

nonexertional demands of such work." SSR 82-62, 1982 WL 31386, at *3.

However, a vocational expert "may offer relevant evidence within his or her

expertise or knowledge concerning the physical and mental demands of a

claimant's past relevant work . . . [and] whether a person [with the same RFC as

the claimant] . . . can meet the demands of the claimant's previous work." 20

C.F.R. § 404.1560(b)(2).

The procedures for determining whether a claimant retains the RFC to perform

his or her past relevant work are further described in SSR 82-62. These procedures

explain that:

> The decision as to whether the claimant retains the [RFC] to perform past
> work which has current relevance has far-reaching implications and must
> be developed and explained fully in the disability decision. Since this is an
> important, and in some instances, a controlling issue, every effort must be
> made to secure evidence that resolves the issue as clearly and as
> explicitly as circumstances permit.

SSR 82-62, 1982 WL 31386, at *3. The procedures further explain that, if an ALJ

determines that a claimant retains the RFC to perform a past relevant job, then the

decision must contain: (1) a finding of fact as to the claimant's RFC; (2) a finding of fact

as to the physical and mental demands of the past job/occupation and (3) a finding of

fact that the claimant's RFC would permit a return to his or her past job or occupation.

Id. at *4. However, SSR 82-62 also makes clear that, if an ALJ states that a claimant

retains "[t]he RFC to meet the physical and mental demands of jobs [he or she] has

performed in the past[,] . . . [then the ALJ's statement] is generally a sufficient basis for

a finding of 'not disabled.'" Id. at *3.

Finally, SSR 82-62 provides that "[adequate] documentation will be obtained to

support the decision" that a claimant is capable of performing his or her past relevant

work. Id. Adequate documentation includes:

> [F]actual information about work demands which have a bearing on the medically established limitations. Detailed information about the strength, endurance, manipulative ability, mental demands and other job requirements must be obtained as appropriate. This information will be derived from a detailed description of the work obtained from the claimant, employer, and other informed source. Information concerning job titles, dates work was performed, rate of compensation, tools and machines used, knowledge required, the extent of supervision and independent judgment required, and a description of tasks and responsibilities will permit a judgment as to the skill level and the current relevance of the individual's work experience.

Id.

In the present case, the undersigned finds that the ALJ properly determined that Plaintiff is capable of performing her past relevant work as an office cashier. Prior to step four, the ALJ determined that Plaintiff possesses the RFC to perform sedentary work with certain limitations. (R. 16). Then, at step four, the ALJ analyzed whether Plaintiff's RFC allowed her to perform her past relevant work as an office cashier, utilizing the second and third tests detailed in SSR 82-61. (See R. 22). Initially, the ALJ noted that Ms. Baldwin characterized Plaintiff's work as an office cashier as sedentary and skilled, both as it is performed in the national economy and as Plaintiff performed it.[5] (R. 22, 54). The ALJ then reasoned that Plaintiff was capable of working as an office

---

[5] Plaintiff argues that the ALJ erred in classifying the functional demands of Plaintiff's job as an office cashier, as she actually performed it, as sedentary work. (Pl.'s Br. at 17). While it is true that Plaintiff stated in her second Work History Report that the job required her to stand for eight hours a day, which is uncharacteristic of sedentary work, Plaintiff also testified during the administrative hearing that she was never required to lift objects, which is characteristic of sedentary work. (R. 45, 191). Moreover, Plaintiff testified during the administrative hearing that she did not believe she could return to her job as an office cashier because she would be required to "constantly us[e her] hands to count money," not because the job required her to stand for long periods of time. (Id.). However, any error on the part of the ALJ's in classifying Plaintiff's work as sedentary is harmless in nature. Even if Plaintiff is not able to return to the job of office cashier as she actually performed it, the ALJ found that Plaintiff is able to perform the job as it is generally performed throughout the national economy and Plaintiff does not dispute that the job is generally considered sedentary work. See Norman v. Comm'r of Soc. Sec., No.

cashier because:

> [T]he vocational expert testified at the hearing that a hypothetical individual with the limitations set forth in the . . . [RFC] would be able to perform [Plaintiff's] past relevant work as an office cashier. Further, in comparing [Plaintiff's RFC] with the physical and mental demands of these types of past relevant work the undersigned finds that [Plaintiff] is able to perform her past relevant work as an office cashier as she actually performed it and as it is generally performed according to the testimony of the vocational expert.

(Id.). The ALJ thus followed the procedures set forth in SSR 82-62, including supplying the required findings of fact. See Thompson v. Astrue, 442 F. App'x. 804, 807 (4th Cir. 2011) (holding the ALJ "made the required findings [of fact]" when the ALJ questioned the vocational expert about the nature of the plaintiff's previous work, the vocational expert testified as to the skill and exertional levels of the previous work and the ALJ compared the RFC with the vocational expert's testimony). Consequently, the ALJ followed the proper procedures when determining that Plaintiff is capable of performing her past relevant work as an office cashier.

Plaintiff argues that the ALJ failed to "develop clarifying evidence regarding [Plaintiff's] prior relevant work" as an office cashier. (Pl.'s Br. at 15). In making this argument, Plaintiff relies on the assumption that the ALJ misclassified Plaintiff's job in the cash office at Wal-Mart as that of an office cashier. (Pl.'s Reply at 1-4). The undersigned finds, however, that Plaintiff's argument lacks merit. As previously determined in Part VI.C.1, the undersigned properly classified Plaintiff's job at Wal-Mart

---

2:14-CV-33, 2014 WL 5365290, at *20 (N.D. W. Va. Oct. 21, 2014) (stating that, when an error is inconsequential to the ultimate disability determination, the error is harmless in nature). Some confusion also exists regarding whether the job of office cashier is a skilled or semi-skilled position. (Pl.'s Br. at 16 n.4). However, any error on the part of the ALJ in labeling the position as a semi-skilled position is harmless in nature because the same Grid Rule would apply in either situation. See 20 C.F.R. § Pt. 404, Subpt. P, App. 2, Rule 201.06 (discussing skilled and semi-skilled positions with no transferable skills).

as that of an office cashier and therefore did not need to further clarify the work.

Plaintiff further argues that the ALJ failed to "adequately explain the nonexertional and exertional demands of [Plaintiff's past relevant work] and how [Plaintiff's] RFC would be accommodated by those positions." (Pl.'s Br. at 15). The undersigned disagrees. In making her argument, Plaintiff relies on Platter v. Astrue, No. 1:10-CV-147, 2011 WL 7628535, at *14 (N.D. W. Va. Apr. 27, 2011). (Id. at 14-15). In Platter, the Court held that the ALJ failed to specifically inquire into the demands of the plaintiff's past relevant work and therefore could not logically determine whether the plaintiff was capable of performing her past work. Platter v. Astrue, No. 1:10CV147, 2012 WL 1029573, at *19 (N.D. W. Va. Mar. 26, 2012).

In Platter, however, the plaintiff had not described the physical and mental demands of her previous work whereas, in the present case, Plaintiff detailed the demands of her work as an office cashier in her second Work History Report, dated December 15, 2011. (R. 191). Specifically, in her second Work History Report, Plaintiff stated that she was required to perform the following activities during a normal workday: utilize technical knowledge and skills; utilize machines/tools/equipment; stand, reach and handle small objects for eight hours and handle large objects, stoop and walk for one hour. (Id.). Plaintiff further stated that she was never required to sit, climb, kneel, crouch or crawl. (Id.). Additionally, Plaintiff testified during the administrative hearing regarding the demands of her work as an office cashier, stating that she "really didn't do any lifting at all" during her work. (R. 39, 45). Because Plaintiff detailed the physical and mental demands of her work, the ALJ was not required to repeat this information in her step four analysis. Consequently, the ALJ's determination that Plaintiff possesses the

RFC to perform her past relevant work is supported by substantial evidence.[6]

## VII.   RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying

Plaintiff's application for DIB is supported by substantial evidence. Accordingly, I

**RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 10) be **DENIED**,

Defendant's Motion for Summary Judgment (ECF No. 12) be **GRANTED**, the decision

of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this

Report and Recommendation, file with the Clerk of the Court written objections

identifying the portions of the Report and Recommendation to which objections are

made and the basis for such objections. A copy of such objections should also be

submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to

timely file objections to the Report and Recommendation set forth above will result in

waiver of the right to appeal from a judgment of this Court based upon such Report and

Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91, 94

(4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841,

845-48 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140, 155 (1985).

---

[6] In addition to determining that Plaintiff is capable of performing her past work as an office cashier, the ALJ determined that Plaintiff is capable of performing her past work as a gas station cashier, companion and quick mart cashier. (R. 22). These three jobs are classified as light exertional work, even though the ALJ had determined prior to step four that Plaintiff possesses the RFC to perform sedentary work only. (R. 16, 22). The undersigned notes, however, that the only job the ALJ discusses in her reasoning at step four is Plaintiff's job as an office cashier. The ALJ never explicitly refers to the other three jobs. Nevertheless, any error on the part of the ALJ is harmless in nature because the ALJ's determination that Plaintiff is capable of performing her past work as an office cashier is supported by substantial evidence. See Emigh v. Comm'r of Soc. Sec., No. 3:14-CV-36, 2015 WL 545833, at *21 (N.D. W. Va. Feb. 10, 2015) ("The court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination.").

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 21st day of April, 2016.

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE